Good morning, Your Honors. May it please the Court. Angela Powell on behalf of the appellants. At this time, Your Honors, I'd like to reserve three minutes of my time for rebuttal. The facts of this case are largely undisputed. On October 31, 2016, on Halloween, in the downtown Torrance area, Ms. Shirley took the officers on a pursuit that the District Court found her driving to be erratic, she drove into oncoming traffic, putting others at risk of collision, injury, or death. Ms. Shirley was ultimately forced to stop by a pit maneuver, but she did not stop at that point either. With Officers Garver, Nakayama, Sena, Guell, and Lee surrounding the front of her car, Officer Lalonde drove around to the back of her car in an effort to box her in. Ms. Shirley then reversed her car and collided with Officer Garver. The officers still did not use deadly force at that point. Well, that is when they used deadly force. After the guy she hit in the back ran, that's Lalonde, right? That is when she went forward and they shot her. That's when she went forward, Your Honor. So not when she went backward into Officer Lalonde's car, but when she revved her engine and drove forward toward the officers. But then if you look at the video, she was turning out. And the officer, you can't really see it really well, but the real issue is a genuine issue of material fact. And the video showed that she was turning out as if the jury could decide that she was trying to get away again, as opposed to creating a danger for him. Your Honor, there were three officers who fired that day. The Folsom video, I would submit, it's Excerpts of Record 215, is taken from the perspective of the customer at the Chevron gas station. It doesn't capture what the officers perceived that day. The officers all perceived her coming toward each one of those officers and then turning her wheels. I believe the Chevron video, which at 2 minutes and 35 seconds, Excerpts of Record 219, give you a better perspective, even though it's still not the perspective of the officers that day. Each one of them, from a different vantage point, Officer Garver, Officer Nakayama and Officer Saina, each perceived something differently. In fact, Officer Saina believed that his life was in danger and that of Officer Guell, who was standing next to him. Officer Nakayama, he believed that the life of Officer Guell and then Officer Lee, as she did turn her car and go into that gas station, he believed that Officer Lee and Officer Guell's life was in danger. Officer Garver also believed that the life of Officer Saina and Officer Guell were in danger. But when were the first shots and who first shot at her? Your Honor, it's difficult to determine who shot first. It appears that they all fired simultaneously, which gives rise to the issue in this case. They all perceived an immediate threat at that same point when Ms. Shirley accelerated, revved her engine and came toward the officers, each with a slightly different perspective of who she was going to get. And at that point, Your Honors, the officers knew that if, based upon the pursuit, that if they did not use deadly force to stop Ms. Shirley, she would have continued to go down her path. And at that point, even though she had already been in the neighborhood of the Torrance High School and nearby a preschool, now she's at Sepulveda Boulevard, which is, as you can see in the video, approximately six lanes of traffic. It's 2.30 in the afternoon. It's heavily populated with occupied vehicles. Their concern was that if they had continued to let Ms. Shirley go, they had made many efforts to stop her. It wasn't the first time when Officer Okazaki finally was able to use the pit maneuver that stopped her. This was his second or third attempt to stop Ms. Shirley. So everything from the officer's perspective, a reasonable police officer on the scene, not in hindsight, Your Honors, would believe that Ms. Shirley presented an immediate threat. It seems like Officer Lalonde didn't act like he thought she was a danger. His behavior on the video is really odd to me because she backs up into his car. Maybe that was on purpose or maybe it wasn't. But then he gets out and he basically runs right where she could hit him if he thought she was a risk. I don't understand what that's about. Can you explain that at all? Your Honor, I would draw the distinction between the Folsom video and the Chevron video. Because what captures on the Chevron video is when Officer Lalonde is running out of his car, it accurately depicts it a bit better than the Folsom video does. For whatever reason, the Folsom video, perhaps because he was behind a barrier, doesn't show when exactly Officer Lalonde was running away. But he was, in fact, running away from Ms. Shirley. Really? Because it looks like he's running right by her instead of running away. He could have gone backwards, but instead he goes forwards, right by her car, right by where she could hit him. It's still, Your Honors, I believe to the left of where Ms. Shirley was. She was backing up and it's a split second that this happens. So he is in best effort to try and get away, probably because he sees the other officers with their guns drawn trying to get out of their line of sight. So he runs to the left of Ms. Shirley. And the left is where she ultimately drives. Ultimately. Not initially, though. Initially she does drive forward and then her wheels turn to the left and she goes to the left. Where's the officer? It's hard to see where the officer was at risk. And I guess it would really make a difference who shot first. And you can't really tell that. I don't know if they would testify. I don't know if that's in the record. But it seems to me the officer who was greatest risk was the one that was in front of the car. And it's really hard to tell if he was at risk because she turned. And that's why I think maybe there's, I mean, I'm wondering if there's a genuine issue of material fact. No, Your Honor. Because the officer, I don't know if the court is referring to Officer Lee. He was seated in his car getting out of his vehicle as Ms. Shirley turned to the left and then took his vehicle up into the pavement of the Chevron gas station. Or if you were to draw his weapon at that point, Your Honor, you see him running. But the other officers, Officer Guell had non-lethal. He had a taser. So the other officers who all had their weapons drawn at that point used deadly force because of the exact threat that they all perceived. What was the threat? Because what I perceived to be the threat was the officer who was in front of her vehicle after she backed up, then she moves forward. But I really can't and moving forward, I don't know if that, you know, there's a question of whether that creates a risk for the officers. Your Honor, again, I would direct your attention to the Chevron video. But again, what the officers perceived. Tell me in that Chevron video, which establishes as a matter of law that the officers were at risk and which ones? You see her vehicle driving toward those officers. And, Your Honor, it's not just a matter of were those particular officers at risk? Their belief, their reasonable belief, was that if Ms. Shirley continued to drive either past them or through the Chevron gas station, she presented a deadly threat to the other citizens of Torrance. When you look at this, though, it doesn't seem so automatic that they reasonably perceived a risk. And what you're arguing sounds, this is just my take on this, but it sounds an awful lot like an argument that ought to be made to a jury. Why shouldn't a jury decide what happened here and whether they acted reasonably? For two reasons, Your Honor. One, the officers did perceive a threat. And any reasonable police officer, even the district court, found that there was a threat. The question is, should they have perceived a threat before they shot her? Yes. And, again, you have to tell us the facts that would establish that as a matter of law. Certainly, Your Honor. What the district court found was undisputed was that given her erratic driving pattern prior to when she drove forward toward these officers, the officers had a reasonable belief that had she continued to either drive toward them or drive in any other direction, Your Honor, the members of the public were at risk as well. I don't see any public in the videos. So it seems to me that it had to be the officers who were at risk. And if they, perhaps they were, maybe it's a matter for the jury to decide. But then the question is whether or not she should have been shot. And I think something like 25 bullets. Your Honor, the individual who was taking the video was at the Chevron gas station. His life was at risk. There were other patrons inside that gas station whose lives were at risk. And then you can see from the video the numerous cars. In fact, we have Ms. Boyd's testimony. Numerous cars that are stopped at that intersection whose lives were at risk as well. You know, but the district court said, well, yes, many of the undisputed facts would support a finding that the officers reasonably believed that Shirley posed an immediate threat. And then the district court says, much of the disputed evidence, however, would also support a finding that the use of deadly force was objectively unreasonable. Because in the video, and the court describes some of the things that we've been, my colleagues have been questioning. Your Honor, the So, you know, I don't see what's wrong, where the district court got that wrong. Where the district court got it wrong, Your Honor, is because the court, instead of looking at the facts, he looked at the intent or what Ms. Shirley's actions could have been perceived to be from Ms. Shirley's perspective. I mean, he outlined several different things that is noted in the record. Whether Ms. Shirley was mentally ill. He said whether Ms. Shirley was attempting to drive slowly and get away from the officers. All of those things, still, those are not relevant. It's what the officers perceived. No, they're relevant if you can perceive that from the video. And that's something for the jury to decide. Because it's really, from my perspective, I'm not the jury. And I think Judge Schroeder has a very good point, is if there's a possibility. She was moving slowly, as I see it. And I haven't been a juror in a long time. But that certainly would be something for a jury to decide. Because that's a factual issue. Your Honor, the factual issue is that she was driving slowly. But she was driving toward these officers. Courts have held that driving a car is a deadly weapon. Regardless of the speed at which she's going at. She was threatening the lives of those officers and the other members of the public. What the district court did in this case was he took what could be the subjective intent of Ms. Shirley and said that that created a triable issue. There's no triable issue as to the facts. As to whether or not Ms. Shirley was headed toward these officers, turned her wheel, then drug the other officer, Officer Lee, into that gas station with her where there were several patrons. And then she had been able to continue on onto Sepulveda Boulevard. But, Your Honors, I also want to address in my remaining time, the district court erred in another area, not just with respect to the reasonableness of the officer's conduct that day, but in denying qualified immunity. And we know that that's already been addressed by this court earlier today. And I want to touch on that. The district court in this case did exactly what the United States Supreme Court commanded courts not to do. The district's court analysis of the second prong of the qualified immunity question consisted of the following. This is what Judge Otero found. That unreasonable, excessive force that results in the deprivation of life is the most egregious of Fourth Amendment violations. And as such, is clearly established under the law. He did exactly what the United States Supreme Court cautioned the courts not to do. This year, the Supreme Court reiterated that courts must not define clearly established law at a high level of generality, especially in an excessive force case. And, Your Honor, I submit to you that as of October 31, 2016, there was no legal precedent that would have put these officers on notice that their use of deadly force in these circumstances would violate the Fourth Amendment. On May 27, 2014, the United States Supreme Court in a 9 to 0 decision in Plumhoff versus Rickard found that the outrageously reckless driving posed a grave public risk. In Plumhoff, where the pursuit lasted five minutes and officers were, like here, unable to successfully intervene multiple times, and when the Plumhoff car was finally pinned in, the driver, as here with Ms. Shirley, refused to surrender, collided with a police cruiser, attempted to escape, that was the court's findings in Plumhoff, collided with another police cruiser, and that officer then fired three rounds into the car. The driver then maneuvered onto a street, forcing an officer to step aside to avoid the car. As the driver continued to flee, two other officers fired 12 more shots. But unlike the case, our case, your honors, Plumhoff did not involve a mid, Plumhoff did not involve a midday high traffic area involving businesses, residents, a high school, a preschool, a gas station full of patrons who were capturing this incident on their cell phone video, and a multiple lane intersection full of occupied cars. Most significantly, in Plumhoff, you're over your time. Sorry, I'll give you a minute for rebuttal, but I think we need to stop you. Thank you, your honor. Good morning, your honors. If it may please the court, Boris Trezon for the appellees. Contrary to my colleague's representation, the facts are very much in dispute in this case. As a matter of fact, the appellant's brief lays out the facts in which they believe them to be. The facts that a plaintiff believes them to be are very much different. There is- But are they admissible facts? Well- I mean, as opposed to inferences. Yes, there are admissible facts. For example, there is expert testimony for Mr. Kobayashi, who says that the car that was driven by Ms. Shirley was driven at most at 27 miles an hour. So, even if that's contested, maybe they think it was faster- I'm not sure it matters, because you can hurt someone driving a car at 27 miles an hour, and she's swerving into oncoming traffic. I mean, if she drives straight into an oncoming car that's going 40, now you've got a 60 mile an hour collision. So, I don't really understand how that fact is material- that dispute is material. Actually, I agree with you. And the reason I agree with you is because that part of the pursuit ended. They have her boxed in. They're moving a car behind her. We're dealing with a situation- But I think that part is- I mean, the fact that they started this whole incident by following her, knowing that she's engaging in this very dangerous driving that could have hurt people, doesn't that relate to what would have happened if she had- I mean, on your version of the fact, she was trying to get away, rather than trying to drive into the officers. But if she was trying to get away, why is there any reason to believe she's not going to get away and start driving into oncoming traffic again? Because the fact that there is prior behavior by a person who's clearly experiencing an altered consciousness moment. The officers are trained. They admit it. They've been trained to diagnose on the spot of the people, if the person is behaving, in an irrational moment. And they say it's one of the- I mean, it's a very sad situation. But if she's irrational and so driving into oncoming traffic, that's a real danger to the people on the other side of the road. I don't understand what the officers are supposed to do instead. They're supposed to stop her. But they tried to. They put their cars all around her, and then she drove into them. They did. Well, actually, she didn't. What she is- There's music blasting in the car. The windows are up. The car is clearly experiencing mechanical issues, right? And she does not- It sounds like she went on a long trek. She's trying to turn into the gas station, unfortunately, because she's no longer with us. Well, I mean, yeah, you are saying that. But where's the evidence to establish that? Videos. It's videos clearly show she's turning to a gas station. Well, she's turning, but to the gas station? Well, I think the only open route for her. Well, she just turned, and she didn't get very far. You're right. But all of these are questions of the fact. These are questions for the jury to determine. But I think your opposing counsel argued that what she meant to do isn't really the point, right? It's what the officers would perceive. So she is driving into an area where their officers just feed away. You're right. And that's where the court, where Judge Otero focused his attention. He's focusing attention on the fact that officers do not clear the gas station. He focused his attention on the fact that officers are smiling and laughing at the situation. He's focusing his attention. If they're really this concerned about safety of people, they fired 35 rounds from high-velocity guns directly hitting everything around them. They're firing in the vicinity of gas tanks. They're firing in the vicinity. Counsel, are you saying that Judge Otero said that they were laughing while they were shooting her? No, they were laughing immediately prior to the time they were shooting. They do not appear to be at fear for themselves, at risk. And we have video transcripts. We have audio transcripts of this. We have every single thing for a jury to decide. What were these officers truly perceiving? Were they truly perceiving this to be a threat? And if they're so concerned, as the counsel said, about the fact it's Halloween, the fact they're next to a gas station, the fact there are people all around them, they fired 35 rounds. Not only did they fire 35 rounds, they found it in two instances. Once the car is turning... If they found or they fired 35 rounds, doesn't that indicate, unless they, you know, as you kind of implied and I didn't understand, that they were intending to just go after her, doesn't that also indicate that they might be, in fact, in fear? No, Your Honor, because there's two instances of firing. Even if you give the benefit of the doubt to the initial firing, initial release of the firearm, as she turns, as they already hit her, they fire more round after round after round. He turns and keeps going. They don't know why. Because they already shot her. They don't know how she's behaving. They clearly can see that if they're shooting at her, they're standing feet away. They're disabling the car. They're disabling the person. They're causing her to move forward because now body starts acting involuntarily. She's being struck over and over by bullets. If she's experiencing an altered state of consciousness, we don't know what she's thinking. And it's probably not important, as the counsel says. What we do know is there's various ways to look at these facts. And those facts are for the jury to decide. They can perceive whether officers should be in fear in their lives. They can interpret whether the officers looking and smiling and making comments, frankly, flip comments about the fact that how they're looking at her, if they're truly in fear of their lives. How about you focus on qualified immunity, the other requirement on whether or not there's a clearly established right? There's four cases cited in our briefs that deal with the issue whether the officers are on notice. And I want to address the Plumhoff case because counsel spent so much time on it. Very different situation. Plumhoff, their speed's over 100 miles an hour. They're truly officers in fear for themselves. There is no question that in Plumhoff, you have a highly dangerous situation. Here, even though there was arguably prior dangerous driving, prior erratic driving, this is not the situation here. She is essentially inching forward. She does not take off. She does not gun her engine. You can look at the video. She's literally turned a wheel and moving. That's all she's doing. The Officer Lalonde is parallel and 25 or 35 feet away, depending on how you measure it. The officers in front are protected by their cars. They're not exposed. We have every situation that the only feasible damage is either immediate damage would be to the cars. And then the non-immediate damage would be theoretically somebody in the gas station. But that danger is precipitated by the officers firing in the back. I read Scott v. Harris as telling us that when someone creates a danger, that then the police might have to put other people at risk. We're not supposed to consider the other people at risk because the real issue is the person who created the danger in the first place. And I have trouble seeing how even in this, I mean, it's a very sad situation, but that Ms. Shirley isn't who created the danger here. Well, we don't know if Ms. Shirley created the danger. We believe that whatever prior incident was, physical incident, may have triggered her bipolar condition. We don't know if she's, she is diagnosed by- Well, it may not be her fault in some level, but it was her driving that started all this. It's not like the officers came and started shooting the gas station with no provocation. Your Honor, and I would agree with that because that's a rational conclusion. Something occurred that caused her to drive in a manner we don't expect a reasonable driver to do. Why can't the officers then think this is a person acting irrationally? There may be a really sad cause of that, but there are a lot of people right near her that she could hit. Isn't that for the jury to decide? I mean, Scott B. Harris, you could say the same thing. And the Supreme Court said, look at the video. And I don't know. I look at these videos and I think I would have been really scared if I was one of these officers. I mean, they tried to stop her with their cars first. But then when that didn't work at that point, because now she's moving toward them. I don't know. It's hard for me to see what the jury could say here. Your Honor, I would understand. But if you were acting really scared, would you be laughing and kind of... So I don't understand how some of the officers are laughing, but it's an objective standard. So I'm not sure how we could kind of have it both ways. Like, I think it's an objective standard. So maybe a couple of these officers subjectively, I don't know what they were doing, but objectively looking at the video, isn't it a dangerous situation? It's an unfortunate situation. And it's a situation that could have became dangerous, frankly, by the actions of the officers. There are less lethal ways. And we cited four cases dealing with qualified immunity. We cited Adam v. Spears for the proposition of why this conduct, this very conduct actually puts officer in notice. But more importantly, we cited Longoria v. Pinal County, which is a 2017 case. And it says, a shooting of an armed man exhibiting bizarre suicidal behavior is not objectively reasonable. Now the question becomes, she's behind the wheel of a car, but so is everybody. There's instances where people drive erratically that does not give somebody a right to shoot them. She has stopped. Pit maneuver, otherwise, they have blocked her in. They can, there are less lethal ways available to them to stop her. They can disable the car. They can do anything. I mean, maybe they thought once they had her surrounded, that she would stop. And so, I mean, if they hadn't thought that, maybe they could have shot the tires or something. But they probably thought once she was surrounded, she would stop, but then she didn't stop. So then it's a moment. They only have a moment. The situation, if you wish, the video took longer than a moment. I mean, I've watched the videos. I don't know. It seems like they're pretty close to her. So it doesn't take very long to drive that far. You know what? I have at this point, I have watched the video so many times. I think it's burned into my mind, unfortunately, right? I feel every single shot as it's fired. And for life of me, I don't understand if they're laughing, if they're smiling, if Officer Lalonde is not running, but he's moseying along, right? There's no sense that anybody's perceiving this to be a threat. Well, what about though, and I keep repeating this, in the video, the officer that was at greatest risk was the one that was in front of her car. And I mean, isn't that enough right there when she then, she is erratic. That is established as an undisputed fact. They don't know why. You say bipolar, whatever. They can't say that. They know she's erratic. They don't know why. And that could be because she's on drugs. And that makes somebody on occasion more erratic. The police officers know that more than anyone else. And then she moves towards him. Isn't that enough? No, Your Honor, because the officer directly in front of her, he's not standing unprotected in front of her. He's behind a protected portion of the vehicle. Now, the difference is, Your Honor, I think... You should explain what you mean by that. Sure, he's behind the door. Yeah, but if she hits the... I mean, that doesn't mean he's protected. She can't really hit the door. She would hit the front of the car. And Your Honor, when you made that movement with your hand, your movement was faster than the rate at which she was moving. She literally... Where did the officer go? When she started moving, what choice did he have? He had three choices, Your Honor. He can move inside the car, which would protect him. Well, I mean, so fast? I mean, why is that as a matter of law? Why does he have to do that? Your Honor, because he's supposed to do reasonable things to use less lethal means in order to protect even this person, to protect even Ms. Shirley. He can... Does he have to do it? No. Theoretically, every single time you walk through a parking lot, a car starts backing out. An officer is entitled to pull out a gun and shoot him. But a rational way is to step back a little bit and let the car pass or to do something less lethal. We have lethal force, 35 rounds, one after another, after another, after another. And I think we do know the sequence was which shots were started. And once an officer starts shooting, all the others join in. Well, that's true. But let's assume that the officer who was there, that we've been talking about, I'm sorry, I don't remember his name, but who was there in front of her car could have done something to protect himself. The other officers couldn't see that. They knew he was there. And we don't know who began shooting. Well, Your Honor, respectful of my estimate, how does shooting her protect the officer? If anything, it exposes him to greater danger. If she's moving, now she loses the ability to stop moving. Shooting her does not protect the officers. The car is in forward motion. It stops it from accelerating faster, doesn't it? Actually, probably not. You probably have, you have something, and it's not on the record, but there is something called the dead foot. But it has to be in the record. Right. But as a common knowledge, if a person loses, if a person ceases to breathe, their body will move forward. They're actually at risk that because they're dead, they will accelerate. Do you have an expert witness that will say that? It's not on the record. But yes, we do, Your Honor. Well, it's not on the record. Correct. And I can't help that part of it. But ultimately, the officer is protected. And we believe the district court got it right. It is, we're not saying we're supposed to win on the papers. We're supposed to win. It's a question of fact for the jury to decide. And the court viewed everything. It viewed in the light. Well, it's a question of fact for the jury to decide excessive force. But if you're suggesting on whether or not in qualified immunity, there was an established right, and that the officers didn't comply with that particular right, that's a legal issue. It is a legal issue. Unless you're saying we have to have interrogatories to go to the jury to establish something before we can determine whether there's qualified immunity as a matter of law. I don't know what you're saying. Well, what I'm saying is viewing the evidence that is presented before the court and viewing the evidence, the evidence may be viewed in multiple ways. Those are the questions of the fact, right? And the court exercised its discretion. It viewed the facts and it says, I do not believe there's qualified immunity. The jury could, after hearing the evidence, decide. Of course. And that's what we're saying. We're not winning or losing the case on motions. We're losing the case to the, we're winning or losing the case to the jury. Lot of information, highly unusual case. There's almost like a news coverage of this event at this point. There's so many videos of this. And each one of those is a piece of evidence for trial or fact away. And Judge Otero waited and he says, you know what? Based on what I'm looking, based on these facts, I do not find qualified immunity. And I do not find whether, as a matter of law, officers use reasonable force. Thank you, counsel. Thank you. Whether or not Ms. Shirley was in an altered state, had an altered conscious is not relevant from the perspective of the police officers. The police officers had to observe her actions, not what she may have been experiencing inside that car, but what her actions were. And the actions that Ms. Shirley displayed that day presented a dangerous and deadly threat to not just the officers, but to the public. Counsel repeatedly said that there is no clearly established right at this time. To the contrary. The case is all established that the officers in this circumstance would be entitled to use deadly force. Adams versus Spears was a completely different case where the court in that instance found that we had a road police officer who had his own agenda. But counsel doesn't cite to any other case that would have suggested that the officers in this case would have had notice that firing at Ms. Shirley was in violation of a clearly established right. And your honor, Judge Freeland, you noted that in Scott versus Harris, this is exactly what the court in that case looked at. And the mere existence, this is what the court said, of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no genuine issue of material fact. The things that counsel has raised, that the district court raised, have nothing to do with any material facts that are in dispute. These are all theories. Theories that were outlined by the district court. Theories that plaintiff's counsel is suggesting, but they don't raise a triable issue of fact. Thank you, counsel. Thank you both sides for the helpful arguments. This case is submitted.
judges: Schroeder, Friedland, Silver